Below is an Opinion of the Court.

_____

PETER C. McKITTRICK
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re:                                      )
                                            ) Bankruptcy Case No.
MICKEY DWAIN SHAUL and MICHELLE             ) 16-31314-pcm13
REFVIK SHAUL,                               )
                                            )
                        Debtors.            )
_____ )
                                            )
SUZANNE KUNDA,                              ) Adversary No. 16-3091-pcm
                                            )
                        Plaintiff,          ) MEMORANDUM OPINION
                                            )
        v.                                  )
                                            )
MICKEY DWAIN SHAUL and MICHELLE             )
REFVIK SHAUL,                               )
                                            )
                        Defendants.         )
_____ )

Plaintiff Suzanne Kunda ("plaintiff") filed this complaint to determine the dischargeability of a judgment for $153,251.80 she obtained in Washington state court.

The judgment arises out of a construction remodeling job that debtor Mickey Shaul, through his dba Mick Shaul Construction, undertook for plaintiff in Walla Walla, Washington. Plaintiff argues that the judgment

Page 1 -   MEMORANDUM OPINION

is nondischargeable under 11 U.S.C. § 523(a)(2)(A), because it is based on fraud.

The parties agreed to submit this claim to the court based solely on portions of the state court trial transcript that the parties deemed relevant, along with some of the exhibits that were submitted to and documents filed in the state court. This court did not take any live testimony. The parties presented argument at a hearing on November 8, 2017. Although not expressly stated at that hearing, the court admits into the record the trial transcript and Exhibits 1 - 13 and 49.[1]

FACTS

Most of the relevant facts were stipulated by the parties. To the extent the following facts were not stipulated, the court finds the facts based on the state court trial transcript and the exhibits presented.

After plaintiff purchased an early 1900s house in June 2010, she wanted to make improvements to and remodel the house. She was referred

---

[1] The exhibits submitted to this court are numbered differently from the numbers they bore in the state court trial. The parties did not provide the court with any cross-reference. Further, the parties deleted many of the exhibit numbers from the transcript.

At the hearing on this complaint, the court asked the parties to identify what exhibit in this court's record corresponds to state court Exhibit 49. On November 22, 2017, the parties submitted a stipulation to include the state court Exhibit 49 in the record here, based on "the court's request for additional trial exhibits." Just to be clear, the record was closed to evidence by the time of the hearing, and although this court asked the parties to identify what exhibit in this court corresponded to Exhibit 49 in the state court, it never requested nor authorized the filing of more exhibits with the court. Nonetheless, based on the parties' stipulation, I will admit Exhibit 49.

Page 2 - MEMORANDUM OPINION

to Mickey Shaul ("Mick")[2] as a potential contractor.  Debtor Michelle Shaul ("Michelle") contacted plaintiff and recommended her husband for the job.  Plaintiff responded, and plaintiff and Mick communicated about the project.  Mick visited the house and provided plaintiff with a brief report of issues in the house that could be improved and remodeled. Plaintiff voluntarily paid Mick $2,500 for his "good ideas" for the house.

In December 2010, Mick presented plaintiff a proposal for the work to be done on the house, and a bid.  The proposal contained a bid for certain work the parties agreed on, as well as a separate list of potential additions to the work and the corresponding extra charges.

The proposal was a flat-fee contract, for a total project cost of $210,842.67, plus an undetermined "percentage of the total job + tax." Exh. 3.  Any changes from the specifications of the proposal that involved extra costs were to be made only on written orders.  The proposal called for $30,000 down, with progress payments monthly and the balance on completion, which was estimated to be June 30, 2011.

Plaintiff accepted the proposal and paid the down payment in two checks on December 14, 2010, and January 5, 2011.  She also paid Mick $10,000 as part of his contractor's fee in mid-December.

Mick began work on the project.  He made a draw request for $30,000 on February 8, 2011, which plaintiff paid.  Plaintiff paid Mick other draws, generally every two months, and contractor's fees, ultimately paying him a total of $260,206.  This included $20,000 that was intended

---

[2] Because both Mr. and Mrs. Shaul are named as defendants, for clarity I will refer to them individually by their first names.

to be Mick's contractor's fee.

During the course of construction, plaintiff requested an itemization of the costs of construction to date and how her draws were applied to those costs. Mick provided two handwritten documents, one in June 2011 that was labeled "Thru mid-May 2011" and the other labeled "August 29, 2011," as accountings for the progress so far.

As construction proceeded, certain parts of the project were changed or added. No changes were memorialized by a written change order.

The project was not completed by the estimated date of June 30, 2011. In November 2011, Mick asked plaintiff to begin paying some subcontractors directly, which she did. The costs for payments to those subcontractors were included in the original agreement as part of the fixed fee. Mick continued to work on the project until May 8, 2012, at which time there was a dispute about the new roof line. The improvements were not complete when he left the job after receiving a letter from plaintiff's attorney demanding that he complete the project without requesting any additional draws. The parties disagreed about change orders, payments to subcontractors, and handwritten accountings for how funds were spent. Plaintiff completed the work needed for an occupancy permit using existing or new subcontractors, incurring substantial additional costs.

Plaintiff filed a complaint against Mick and Michelle Shaul ("debtors") in Washington state court, alleging a number of claims, including breach of contract, unjust enrichment, fraud, conversion, and violation of Washington's consumer protection act. Debtors counterclaimed for breach of contract and lien foreclosure. At the

trial, CPA Andrew Block testified that the difference between the funds plaintiff paid to Mick and the amount spent on construction-related costs was $127,000.

The Washington jury found for debtors on their breach of contract claim but awarded no damages. It found for debtors on plaintiff's fraud and consumer protection act claims, and for plaintiff on her other claims. The Washington court entered judgment against debtors for a total amount of $153,251.80 on the claims for breach of contract, unjust enrichment, and conversion, comprised of $132,346 principal plus attorney fees and costs. Post-judgment interest accrues at 12% per year.

ARGUMENTS

Plaintiff argues that the state court judgment resulted from debtors' actual fraud, fraudulent misrepresentations, and false pretenses.[3] In particular, she alleges:

(1) that the project proposal misrepresented (a) the nature and cost of the project; (b) the nature of change orders; and (c) that the proposal and drawings could be completed as drafted;

(2) that Mick's two accountings contained fraudulent misrepresentations about the amounts actually spent to date on construction costs and included amounts claimed to have been expended but that in fact were not paid by Mick; and

(3) that Mick accepted the draws under false pretenses, because those funds were to be used for construction costs but a good portion of

---

[3] As this court held in ruling on debtors' motion for summary judgment, issue preclusion does not bar plaintiff from asserting fraud under § 523(a)(2)(A), because the Washington fraud burden of proof is a higher standard than the preponderance standard applied here.

Page 5 -  MEMORANDUM OPINION

the funds were not used for that purpose.

She argues that Mick made the representations knowing they were false with the intent to deceive, that plaintiff reasonably relied on them, and that she was damaged as a result. She asserts that both debtors are responsible for the fraud.

Debtors argue that the proposal did not contain false representations. In their view, the increased costs were the result of plaintiff's changes to the project, and the contract price included an unspecified contractor's fee on top of the fixed cost, which Mick was entitled to keep and spend as he wished. They assert that the accountings were not fraudulent, in that they did not necessarily relate to costs already expended as opposed to expected costs. The draw checks were not obtained under  pretenses, they argue, because the contract did not require that the draws be used solely for construction costs, and Mick did not make any representations about how the funds would be spent.

According to debtors, Mick did not make any statements with the intent to deceive and any reliance by plaintiff was not reasonable. They also argue that there is no proof that Michelle was involved in any of the alleged fraud, and therefore the debt as to her should be discharged, even if Mick's obligation is not dischargeable.

DISCUSSION

Section 523(a)(2)(A) excepts from discharge a debt for money to the extent it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

To prevail on a claim under section 523(a)(2)(A), a creditor

Page 6 - MEMORANDUM OPINION

must demonstrate five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

In re Deitz, 760 F.3d 1038, 1050 (9th Cir. 2014). It is the creditor's burden to prove each of those elements by a preponderance of the evidence. Id.

"Actual fraud consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another — something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." 4 Collier on Bankruptcy ¶ 523.08[1][e] (16th ed. 2016). There need not be a false representation; fraud includes deception or trickery done intentionally. Husky Intern. Electronics, Inc. v. Ritz, 136 S.Ct. 1581, 1586 (2016).

Intent to deceive is determined under the totality of the circumstances, and may be inferred from the facts. In re Eashai, 87 F.3d 1082, 1087 (9th Cir. 1996).

Justifiable reliance "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Field v. Mans, 516 U.S. 59, 71 (1995) (quoting Restatement (Second) Torts § 545A, Comment b (1976)).

The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, "negligence in failing to discover an intentional misrepresentation is no defense." However, a person cannot rely on a representation if "he knows that it is false or its falsity is obvious to him." In sum, although a person ordinarily has no duty to investigate the truth of a

Page 7 –  MEMORANDUM OPINION

representation, "a person cannot purport to rely on preposterous representations or close his eyes 'to avoid discovery of the truth.'"

In re Apte, 180 B.R. 223, 229 (9th Cir. BAP 1995) (citations omitted), quoted with approval in Eashai, 87 F.3d at 1090.

A.   Misrepresentations

   1.   Misrepresentations in the project proposal

   Plaintiff argues that the project proposal, showing a fixed cost of $210,842.67 plus an unspecified percentage of the total job for a contractor's fee plus taxes, misrepresented Mick's intent and ability to complete the job as agreed.

   She asserts that it was clear that Mick did not intend to perform as provided in the proposal, because he immediately started using funds she paid him for personal expenses rather than paying for construction related costs; he intended to be paid an additional $50 per hour for his labor, which was not included in the proposal; changes to the project were not documented by change orders as required by the proposal; and the drawings accompanying the proposal could not be completed as drawn.

   Despite the fact that the proposal was a flat-fee contract, it was only a flat fee for the work that was outlined in the proposal.  The proposal (Exh. 3) says that the total is $210,842.67 plus "percentage of total job + tax."  The proposal is supported by drawings and a bid, which also says that the "bid is not all inclusive at this point," and that the added percentage for overhead and profit as well as sales tax of approximately 8.6% is not included.  Exh. 3 at pp.5, 6.

   It is clear that the proposal was not intended to be the final cost of construction; there were other charges that were specifically not

included and that would add to the total cost.  For example, there was an
unspecified contractor's fee.  Also, the proposal stated that there would
need to be an egress window, which was not part of the contract.  Exh. 3
at p.1.  Note 2 to the itemized bid stated that "Items listed in this bid
are typically allowance based," and "anything beyond the allowance would
be an 'extra' cost."  Exh. 3 at p.5.  Also notable is that, although the
bid called for "complete tear out" of the main floor, it called only for
roughing in the kitchen plumbing, but no appliances or sink.  Exh. 3 at
pp.2, 3.  This shows that both parties understood that the entire
remodeling of the home would not be completed for the price indicated,
and that there were additional costs contemplated.  The proposal was not
specific on a number of matters, and the cost to complete the house and
the work to be done by Mick was certain to vary from the proposal.

As for Mick's purchase of a used pickup truck within two weeks after
he had received his first payments from plaintiff on the project, I do
not find that this demonstrates that he did not intend or have the
ability to complete the project as outlined in the proposal.  Mick
testified that he purchased a 1999 pickup truck in early 2011 for around
$6,500.  Transcript at pp.108:30 - 109:13.  The Profit and Loss Detail,
Exh. 8, shows an expenditure of $6,039.50 to Cars of Kentucky on January
3, 2011, with a memo line of "Ford F350."  Exh. 8 at p.7.  The detail
also shows two other payments to Cars of Kentucky, one for $500.00 on
December 27, 2010, and one for $1,100.00 on January 3, 2011.  Id.  It is
not clear what those expenditures are for.

Even if all three of those expenditures, totaling $7,639.50, were
for the used pickup truck, I am not convinced that the purchase shows

that Mick did not intend to complete the work outlined in the proposal, or that Mick intended at the inception of the contract to divert the payments from the plaintiff and not complete the job. Plaintiff had paid Mick $10,000 in two checks of $5,000 each on December 14, 2010, and December 16, 2010. Each check was designated "general contractor fee," which was Mick's profit on the job and which he was entitled to spend as he saw fit. Using the funds to purchase a used vehicle does not show that he did not intend or did not have the ability to complete the project for the price included in the proposal. Although the pickup truck was not an expense of the project, buying a modest pickup truck to assist in Mick's work is consistent with the concept of working at the job and intending to provide the services plaintiff contracted to receive.

Plaintiff points to Mick's testimony that he billed $50 per hour for his services, an amount that she argues was not included in the proposal and that Mick intended to charge in addition to the $210,000 contract price. <u>See</u> Transcript at pp.111, 145. I agree that the contract does not specify an hourly rate for Mick's services and that his profit and overhead were to be an added unspecified percentage. However, I disagree that the contract does not include any payment to Mick, other than his percentage of profit and overhead. There were numerous line items in the bid supporting the proposal for which the "Subcontractor" was listed as "General." Exh. 3 at pp.2-5. Mick explained that meant that he, as the general contractor, would do the work. These line items include a set amount, and not a hourly figure (<u>e.g.</u>, "Main Floor Demolition" for $6,400 (Exh. 3 at p.2)). Transcript at p.147. It is unclear whether Mick

calculated these estimates based on an hourly rate of $50, or by some other method. Regardless, the fact that he was to be paid for his labor on the project, in addition to receiving a percentage for profit, is not inconsistent with the terms of his proposal.

The costs in the proposal for the tasks to be completed by the general contractor - Mick - totaled approximately $114,000 of the $210,000 contract price. Many of the general contractor items, such as the main floor demolition, involved purely labor, with little or no materials. Mick was entitled to be paid the contract amount for those services. If he provided those services himself instead of using subcontractors, he was entitled to keep and spend those payments as he wished.

There is no question that Mick did an extremely poor job of documenting this project from start to finish. Mick should have been more clear about how much he would be paid for his role as general contractor and his labor on the project. But the fact that the contract was sloppy does not show by a preponderance of the evidence that Mick never intended to perform the work.

Next, plaintiff argues that the proposal misrepresented the nature of change orders, because Mick never provided written change orders to document the changes that plaintiff requested or to which she agreed.

Both Mick and plaintiff testified that there were changes made to the project as it went along, and plaintiff testified that she understood she had to pay for some changes despite the lack of a written change order. Again, Mick's attention to the financial details of this job was extremely sloppy. He should have been clear with plaintiff about the

Page 11 - MEMORANDUM OPINION

costs of changes, and he should have confirmed them in writing. However, I do not see that Mick's failure to document significant changes to the project with written change orders demonstrates a false representation about the cost of the project. Plaintiff acknowledged that changes could increase the cost of the project, without regard to whether or not a change order was executed. Both parties continued to move ahead with the project despite significant changes, without any written documentation. This does not demonstrate a knowing misrepresentation by Mick.

Plaintiff argues that the proposal misrepresented that the proposal and drawings could be completed as drafted. I disagree. The proposal indicated that it was not all inclusive at the time made. Exh. 3 at p.5. It is clear that the work identified in the proposal was not intended to complete the house to the point where it would be ready for occupancy. The proposal called only for roughing in the plumbing for the kitchen; it did not include installing appliances or a sink. Plaintiff testified that she paid other contractors to finish the kitchen because she could not move in without a working kitchen, implying that those services were included in the original proposal. In fact, those costs were never part of the original contract, and Mick's failure to provide those services does not demonstrate that he lacked the intent to perform the proposal at the outset.

Plaintiff focuses on the second story roof line, arguing that she understood that the lifting of the roof line would result in a full second story but in fact Mick never intended to complete a full second story.

Plaintiff testified that Mick told her he had made a mistake and

that the second story walls were going to be only four feet high, contrary to the design that had been submitted to the city for approval. Transcript at pp.20-21. Mick testified that the plans never called for a full second story and that in fact the walls could be framed at six feet. Id. at p.107.

It is not clear from either the drawings attached to the proposal or the transcript what the height of the second story was supposed to be. The drawing of the elevation, Exh. 3 at p.9, appears to show close to a full story, but it is not clear. Mick referred in his testimony to other exhibits that might have made it possible to determine what the height of the second story was supposed to be under the proposal, but those exhibits were not, as far as I can tell, provided to this court in this adversary proceeding.

It appears that plaintiff's primary complaint about the roof was that she did not like the way the roof looked after it was framed. Plaintiff has the burden of proving the elements of her claim, including misrepresentations. I cannot tell from the evidence whether the roof was built as proposed or whether it was not built as proposed. Even if the roof line in the proposal was different from how it could actually be built, plaintiff has not proved that the difference was a result of intentional misrepresentation rather than simply a mistake. Plaintiff has not met her burden of proof to show that the proposal misrepresented the height of the roof or, if it did, that the misrepresentation was made with an intent to defraud her.

2. <u>Misrepresentations in the two accountings</u>

Plaintiff alleges that the two handwritten accountings of amounts

Page 13 - MEMORANDUM OPINION

spent to date on the project contained fraudulent misrepresentations of the construction costs, and included amounts Mick claimed to have expended but in fact he had not.  These representations, she argues, were made to induce her into paying Mick more money that he used for personal expenses instead of on construction work on her house.

Plaintiff testified that she requested accountings from Mick so she could see where the money she had given him for the project was going. The evidence shows that plaintiff paid Mick $15,000 on January 1, 2011, for construction costs, and then another $30,000 draw on February 10, 2011.  Exh. 4 at pp.7, 8.  On February 8, 2011, plaintiff sent Michelle an email asking for an itemization.  She indicated that she was not sure what a "draw" was, and wanted clarification.  The email continued:

> In addition to answering the above question, would it be possible to email us an itemized list of the work that has been done so far, with the cost for each item?  We appreciate the pictures tremendously (keep them coming) but it would be a great help to attach a hard number to the different renovation jobs we see in the photos.

Exh. 1 at p.2.  The parties stipulated that Mick did not provide her with an itemization until June, and labeled it "Thru mid-May 2011."  In the meantime, plaintiff paid him the $30,000 draw in February and another $27,206 on April 8, 2011, plus a separate April 8 check for $5,000 as the contractor's fee, despite not having the itemization.  Exh. 4.

Mick's May accounting itemized $82,400 in construction costs, and payments from plaintiff totaling $89,000.  Exh. 5.

After she received the May accounting, plaintiff continued to ask for an itemized account of amounts spent on her project.  Mick provided her a second itemized accounting, dated August 29, 2011, that shows

$113,324.59 for work on the project.  As of this date, plaintiff had paid Mick another $33,000 in June, for a total of $122,000.  Exh. 4 at p.11. She testified that the accountings "made no sense."  Transcript at p.17.

Plaintiff argues that the accountings were misrepresentations, because at the time of the May accounting Mick had in fact not incurred anywhere near $82,000 in construction-related expenses, and had spent tens of thousands of dollars on personal, family, and other non-construction expenses during the same period of time.  Exh. 11 at p.13. She makes the same argument as to the August accounting.

The CPA accounting of debtors' income and expenses, Exh. 8, categorizes amounts expended from their bank account[4] as either construction-related or non-construction-related.

A few comments about this accounting.  First, the accountant made some assumptions about what was construction-related and what was not. He did not seek or receive any input from Mick or Michelle, and it appears that some of the expenses he categorized as non-construction-related were in fact costs related to the work on plaintiff's house. Debtors argued that the accounting was not credible because of the lack of input from debtors and the misclassification of various expenses. Although I am persuaded that the accounting does not catagorize each and every expense correctly, the majority of the expenses are clearly either business expenses or personal expenses.  Second, Exhibit 8 does not subtotal amounts through May and then through August, so it is difficult

---

[4]    Debtors kept a single bank account into which all deposits were made and out of which all expenditures were made.  Over the course of construction, they deposited $260,208 in payments from plaintiff and only $35,871 total from other sources.

1  to determine precisely what amounts were spent for what expenses during
2  the time frame covered by Mick's accountings.  However, for purposes of
3  this discussion, I will accept the numbers provided in Exhibit 11, which
4  breaks out construction and non-construction expenditures as of
5  particular dates.

6      Exhibit 11 at p.13 shows that, through April-May 2011, debtors had
7  spent $41,262.89 on construction expenses and $61,603.35 on personal
8  expenses.  Exhibit 11 at p.22 shows that through August 26, 2011,
9  construction expenses were $60,432.57 and personal expenses were
10 $92,261.87.

11     As with Mick's failure to provide written change orders, his failure
12 to provide an intelligible accounting to plaintiff was unacceptable.  In
13 her February 8 email, plaintiff asked for an itemization of work
14 completed to date, which deserved a timely and accurate response.  Mick's
15 handwritten accounting provided in June was not timely and was not
16 particularly helpful.  It is understandable that, a year later, plaintiff
17 felt betrayed.  However, the fact remains that Mick did work at the site,
18 and was entitled to be paid for the labor he personally performed on the
19 project essentially as a subcontractor.  Neither the CPA accounting nor
20 Exhibit 11 takes into account the fact that Mick himself provided a
21 significant amount of the labor on the project.  There would not be a
22 record of construction costs expended for purely labor services, as there
23 would be if a subcontractor had been paid for doing the work or if the
24 cost included materials.  The amounts paid purely for Mick's labor would
25 not be reflected in the accounting as a construction-related expense, but
26 debtors were entitled to spend the funds received for those services as

Page 16 - MEMORANDUM OPINION

they wished.  The evidence does not show exactly how much Mick earned as compared to what he spent on personal expenses.  Nonetheless, the lack of coherency and detail in the accounting does not mean that the accounting was intentionally false.

Plaintiff argues that the accountings were false, because some of the line items were for work or other expenses that had not actually been completed or paid at the time of the accounting.

There was testimony that some of the line items in the accountings were not accurate.  The accountings each included a line item for taxes – $7,000 in the May accounting, and $8,974.14 in the August accounting. Exh. 3 at pp.1, 3.  Mick testified that he had not paid those taxes at the time of the accountings, and in fact never paid them.  Transcript at pp.158-159.

Mick's accountings also showed payments for permits of $3,800[5] (the May accounting) and $3,787 (the August accounting).  Exh. 3 at pp.1, 3. The CPA accounting shows that Mick actually paid a total of $4,922.58 for permits, $30 in December 2010 and $4,892.58 in January 2011.  Exh. 8 at p.5.

Finally, plaintiff argues that the line item in each accounting of $400 for tree removal was false, because plaintiff actually paid the tree removal costs herself, which was $300.

I am not convinced that Mick's accountings, given to plaintiff to

---

[5]    Plaintiff argues that the May accounting actually shows a total of $8,200 for permits.  The handwritten accounting is not clear, but the line item for permits is $3,800.  In addition, there are two entries below the permit entry for $1,900 and $2,500.  It is not clear that those amounts are for permits.

Page 17 - MEMORANDUM OPINION

document the costs of construction to date, were materially false.  It is true that Mick had not paid the taxes that he itemized in each accounting, but he was liable for those taxes and therefore including that expense was not a falsity.  With regard to the permits, it appears that Mick had in fact paid more for permits than he included in the itemization.  The amount allocated in the proposal for permits was $3,787.  Exh. 3 at p.5.  To the extent Mick had actually spent more on permits than he represented in the accountings, his representation was not material.  His failure to accurately reflect what had actually been paid reduced rather than inflated the total that he represented had been spent on construction costs.

As for the tree removal, plaintiff testified that she paid for such costs herself, and Mick did not remove the trees.  Transcript at p.45.  This representation of a $400 expense was not true.  However, it was not material in the context of a $210,000 project.

3.  <u>Misrepresentations to obtain construction draws</u>

Finally, plaintiff argues that Mick's acceptance of the construction draws was a misrepresentation about how the checks would be spent, constituting false pretenses.  This argument is based on the fact that plaintiff made notations on each check she issued, with some checks designated for the contractor's fee and others designated for work on the project.  Plaintiff argues that, because the draw checks indicated that they were for work on the project (as opposed to payment for the contractor's fee), Mick's acceptance of those checks constituted his representation that the payments would be used solely for construction costs.  Therefore, to the extent debtors used those funds for their

personal or household expenses, plaintiff argues, that use constituted obtaining money under false pretenses.

This argument, as with the prior arguments, is based on the incorrect premise that debtors' use of any of the draw funds for personal and household expenses was wrongful and contrary to the parties' agreement. First, as I explained above, the fact that the CPA accounting shows debtors' payment of non-construction-related expenses with funds paid by plaintiff for the project does not demonstrate that the use of the funds was wrongful. According to the proposal and the bid supporting it, a significant amount of the work done on the project was to be completed by Mick himself, and he was entitled to use the payment for that work for his personal and household expenses.

Second, the fact that plaintiff included a notation on the draw checks she gave to Mick does not mean that the funds were to be held in trust and used only for expenses of construction. As counsel acknowledged at the hearing, if the project had been completed as promised, it would not matter how debtors had spent the funds paid for the project. Plaintiff's understanding that the funds would be used only on her project, while understandable, did not turn the payment into a trust.

I conclude that plaintiff has not demonstrated that Mick's acceptance of the draw checks was done under false pretenses.

B.    Intent to deceive

I have concluded that Mick made a misrepresentation in his handwritten accountings with regard to the amount he paid for tree removal and permits. I do not find either of those misrepresentations

Page 19 - MEMORANDUM OPINION

material in the context of a $210,000 contract. However, even if I were to conclude that there were other misrepresentations, I do not find that the representations were made with an intent to deceive. As I explained earlier, intent to deceive is determined under the totality of the circumstances, and may be inferred from the facts. <u>Eashai</u>, 87 F.3d at 1087.

Plaintiff argues that Mick's intent can be inferred primarily from two facts: that debtors were in financial difficulty when Mick made the proposal and entered into the construction contract with plaintiff, and that debtors spent tens of thousands of dollars from the construction payments not on construction but instead on their personal and household expenses.

The testimony did establish that debtors were experiencing financial distress during the course of Mick's dealings with plaintiff, including when they entered into the agreement and while the work on the project was on-going. That fact alone does not demonstrate an intent to deceive; I agree with debtors that finding work is a legitimate way to earn money to alleviate financial difficulties. The evidence does not convince me that the proposal contained inflated costs in order to induce plaintiff into paying money on the project that Mick did not intend to complete. Nor do I find that Mick's suggestions for changes to the project, with which plaintiff agreed and that increased the cost of the project, were made with an intent to simply run up the cost of the project, rather than to offer ideas that would improve the quality of the renovations. The evidence is not clear as to whether Mick completed the work on those changes, and he continued to work on the project until the parties had

Page 20 - MEMORANDUM OPINION

the falling out over the roof line and Mick left the job.

Nor do I find that the use of funds received from plaintiff for debtors' personal and household expenses demonstrates an intent to defraud. Plaintiff points to the CPA accounting that shows expenditure of $127,392 on non-construction-related expenses, including the Shauls' mortgage and other household expenses, and only $132,818 on construction-related expenses. Exh. 11 at p.1.

However, as I have explained, this argument is based on a false premise. The CPA accounting, while not completely discredited as debtors argue, is only useful for what it shows. It shows expenditures of tens of thousands of dollars on non-construction expenses during the course of the parties' relationship. However, it does not attempt to show what portion of those expenditures was with funds Mick had earned through his labor as the general contractor, as provided in the proposal.

I am not convinced that Mick intended to obtain funds from plaintiff without intending to complete the work on the project as agreed. This appears to be a case where Mick was sloppy in his accounting for the funds he received, and the project suffered increased costs as a result of significant changes that were made to the project as it went along. There were misunderstandings between the parties about costs. Mick failed to respond adequately to plaintiff's requests for information about the progress of the project. Although it is possible that, had I had the opportunity to observe the parties in their testimony, I might have a different view of Mick's testimony and his explanation for why this project fell apart, given the record before me of the cold transcript, I do not infer fraudulent intent from debtors' financial

1 difficulties or the fact that an unspecified amount of money paid by
2 plaintiff did not go to construction costs.

3 C.   Justifiable reliance

4      Even if I were to find false representations from the accounting and
5 acceptance of draw checks as well as intent to defraud, I would not find
6 that plaintiff's reliance on Mick's representations was justifiable.
7 Although it is true that justifiable reliance is based on "the qualities
8 and characteristics of the particular plaintiff, and the circumstances of
9 the particular case, rather than of the application of a community
10 standard of conduct to all cases," Field v. Mans, 516 U.S. at 71, in this
11 case plaintiff has not shown that her reliance was justifiable.

12     Plaintiff testified that she intended her draws to be used solely
13 for construction costs, but the proposal did not require that the funds
14 be so used, and there was no separate trust agreement to that effect.
15 Moreover, plaintiff acknowledged that she continued to make changes that
16 increased costs, and so cannot have relied on the proposal to lock in the
17 cost of the project.  In fact, the proposal itself indicated that it was
18 not all-inclusive.

19     Most significant is the fact that plaintiff testified that Mick's
20 handwritten accountings made no sense to her.  She was on notice by June
21 of 2011 that Mick's accounting did not answer her concerns.  Yet she
22 continued to pay him draws long after the written accountings had been
23 provided, and without requiring additional detail or accountings after
24 August 2011.  Although plaintiff did not have a duty to investigate the
25 truth of the representations in the accountings, she could not ignore the
26 fact that the accountings did not make sense to her or show expenses that

corresponded to the amounts of money she had paid to plaintiff.

Plaintiff makes much of the fact that she was in a serious accident after the work had began on the project, making her more vulnerable to fraud. However, her testimony was that the injury resulted in difficulties with spacial recognition, direction, and orientation, but that with other functions such as the ability to plan or prioritize, she just had to concentrate more. Transcript at p.46. This evidence does not establish that she was more likely to be misled by misrepresentations or that Mick took advantage of her financially as a result of these injuries.[6]

D. <u>Generalized fraud</u>

Plaintiff argued in her trial memorandum that the evidence in this case supports a finding of generalized fraud, relying on <u>Husky</u>, 136 S.Ct. at 1586. There, the Court said that conduct "that counts as 'fraud' and is done with wrongful intent is 'actual fraud'" under § 523(a)(2). Because the Washington state court found conversion, she argues, this court should find that the damages awarded for conversion are nondischargeable as fraudulent.

The state court jury found breach of contract, unjust enrichment, and conversion. It did not, however, specify what damages were awarded for what claims. Neither party in this adversary proceeding could

---

[6] Because I conclude that plaintiff did not prove by a preponderance that Mick made material misrepresentations, that any misrepresentations were made with an intent to defraud, or that she justifiably relied, I do not discuss the other elements of the § 523(a)(2)(A) claim.

Page 23 - MEMORANDUM OPINION

explain where the damages calculation came from.[7]  Therefore, I cannot say that the entire amount of the judgment constituted damages for conversion.  Even if conversion alone were enough to support a finding of actual fraud, plaintiff would still need to demonstrate what portion of the damages resulted from the jury's finding of conversion.  She has failed to make that showing, and therefore has not demonstrated what damages arose from any alleged generalized actual fraud.

Further, for conduct constituting conversion to rise to the level of fraud, there must be wrongful intent.  I have already explained why I conclude that plaintiff has not met her burden of proving intent by a preponderance of the evidence.

This is a construction project that went very wrong, and I am sympathetic to plaintiff's plight.  She found her dream retirement home, with grand expectations of what it would be when renovated.  Shortly after the work on the project began, she had the misfortune of being in a terrible accident.  The renovation project ultimately became a money pit. Mick did a poor job documenting the proposal, and an even worse job of documenting the costs and progress of the project.  Mick failed to communicate adequately with plaintiff and keep a good accounting of how the funds were spent and applied to the work on the project.  He ended up receiving $260,000 (including $20,000 in contractor's fees) and failed to

---

[7]    Exhibit 49, submitted to the court after the close of the hearing, contains a figure of $127,860.40 as the value of the work that Mick had done.  It would appear that the state court's damage award is based on the total amount paid, $260,207, less the $127,860.  However, there is no context for how the $127,860.40 figure was arrived at, and there is no concrete evidence that the jury's damages were actually based on these numbers.

Page 24 – MEMORANDUM OPINION

1   complete the project, leaving plaintiff to hire and pay additional

2   contractors to complete her remodel project.  Debtors spent tens of

3   thousands of dollars on personal and household expenses while leaving

4   plaintiff's remodel project incomplete.  As I said during oral argument,

5   I do not in any way condone Mick's conduct and business practices.

6       Nonetheless, the record before me does not show by a preponderance

7   of the evidence that Mick made knowing misrepresentations with an intent

8   to deceive, or engaged in trickery or deception in order to obtain

9   additional funds from plaintiff.

10  E.   Claim against Michelle

11      Because I have concluded that the evidence does not support a

12  finding of fraud against Mick, and there are no allegations of fraud

13  against Michelle that are unrelated to the claims against Mick, plaintiff

14  has not established that Michelle defrauded her with regard to this

15  project.

16                          CONCLUSION

17      Plaintiff has the burden of proving fraud by a preponderance of the

18  evidence.  I find that she has failed to meet her burden in this case.

19  The debt arising from the state court judgment is dischargeable.

20      Counsel for debtors should submit the judgment.

21                             ###

22  cc:  Erich M. Paetsch
         Michael R. Blaskowsky

23

24

25

26


Page 25 - MEMORANDUM OPINION